Anna T. Neill (State Bar No. 270858)
SPERLING KENNY NACHWALTER
Four Seasons Tower, Suite 1100
1441 Brickell Avenue
Miami, Florida 33131
Telephone:    (305) 373-1000
Facsimile:    (305) 372-1861
Email: aneill@knpa.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**CVS PHARMACY, INC.,**

**Plaintiff,**

v.

**TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS U.S.A., INC., TAKEDA PHARMACEUTICALS AMERICA, INC., TWI PHARMACEUTICALS INC., TWI PHARMACEUTICALS USA, INC., BORA PHARMACEUTICALS CO. LTD., AND UPSHER-SMITH LABORATORIES, LLC**

**Defendants.**

**Case No.:**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................ 1

II.  PARTIES ................................................................................................... 5

III. JURISDICTION AND VENUE ................................................................. 8

IV.  BACKGROUND ...................................................................................... 9

    A.   New Drug Applications and the Listing of Patents in the FDA's Orange Book. .................................................................................. 9

    B.   The Limits of Patent Protection for Drugs .................................... 11

    C.   Regulatory Approval of Generic Drugs. ........................................ 13

    D.   The Paragraph IV Certification Process ........................................ 13

    E.   The 180-day Exclusivity Period for the First-Filer Generic ......... 15

    F.   The Competitive Effects of AB-Rated Generic Competition ........ 16

    G.   Authorized Generics ...................................................................... 17

V.   ANTICOMPETITIVE AGREEMENTS BETWEEN DRUG COMPANIES ...................... 18

    A.   A Brand Manufacturer's Payment of Cash to a Generic Manufacturer to Stay Out of the Market Is One Example of a Reverse Payment ................................. 19

    B.   "No AG" Agreements Are Another Form of a Reverse Payment that Allow Brand and Generic Manufacturers to Share the Gains from Conspiring .................... 20

VI.  OPERATIVE FACTS .............................................................................. 22

    A.   Takeda's Development and Sale of Dexilant ................................. 22

    B.   Takeda's Patents, Orange Book Listings and ANDA Filings by Generic Manufacturers ................................................................. 23

    C.   Takeda's Infringement Suits Against Generic Manufacturers and the 2013 Trial Court Rulings ........................................................ 26

        1.   The Judge Spero Actions .................................................... 26

        2.   The Judge Koh Actions ....................................................... 31

        3.   Non-litigated Patents .......................................................... 36

    D.   Takeda Resolved Each of Its Dexilant Patent Cases After the Initial Trial ................ 36

E.   Takeda's Settlement with TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation from Takeda. ............................................ 38

F.   Takeda Entered Into Other Alleged Improper Agreements With Competitors During This Same Time Period. ................................................ 41

G.   If Takeda Retained the Right to Launch an AG or Received Royalties from TWi, Such Facts Would Not Change the Illegality of Defendants' Agreement ............................................................................................ 42

H.   In the Absence of Defendants' Agreement, At Least Two Generics Would Have Been Available, at a Much Lower Price Point, by No Later than June 15, 2020 ............................................................................................ 44

VII. MARKET POWER AND RELEVANT MARKET ................................................ 46

VIII. ANTICOMPETITIVE EFFECTS ..................................................................... 48

IX.  INTERSTATE COMMERCE ............................................................................ 49

X.   ACCRUAL AND FRAUDULENT CONCEALMENT ..................................... 50

XI.  CLAIMS FOR RELIEF ................................................................................... 51

COUNT ONE – VIOLATION OF 15 U.S.C. § 1 (RESTRAINT OF TRADE - AGAINST ALL DEFENDANTS) .................................................... 51

COUNT TWO – VIOLATION OF 15 U.S.C. § 1  (MARKET ALLOCATION - AGAINST ALL DEFENDANTS) .................................................... 53

COUNT THREE – VIOLATION OF 15 U.S.C. § 2  (MONOPOLIZATION - AGAINST TAKEDA)................................................... 53

XII. DEMAND FOR JUDGMENT............................................................................ 55

XIII. JURY DEMAND.............................................................................................. 55

1    Plaintiff CVS Pharmacy, Inc. ("CVS") brings this civil action against (i) Takeda
2    Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., Takeda Pharmaceuticals
3    America, Inc. (collectively "Takeda"); (ii) TWi Pharmaceuticals Inc., and TWi Pharmaceuticals
4    USA, Inc. (collectively "TWi"); (iii) Bora Pharmaceuticals Co. Ltd. ("Bora"), and (iv) Upsher-
5    Smith Laboratories, LLC. ("Upsher") (together "Defendants"), under the antitrust laws of the
6    United States.  For its Complaint, Plaintiff alleges as follows:

7                          **I.    INTRODUCTION**

8        1.    This lawsuit challenges a horizontal conspiracy and agreement among Defendants
9    to restrain competition in the United States market for the pharmaceutical product Dexilant (the
10   active ingredient of which is dexlansoprazole) and its generic equivalents ("Agreement").

11       2.    Takeda and TWi, two competing pharmaceutical manufacturers, entered into a
12   "reverse payment agreement."  In such an agreement, a patent holder pays an alleged or potential
13   infringer to stay off the market, not to challenge its patents, and/or otherwise not to compete with
14   the patent holder in the market for the patented product.  In a typical or competitive settlement of
15   patent litigation, the infringer pays damages and/or royalties to the patent holder.  But in the
16   "reverse payment" scenario, as alleged herein, the payment flows in the opposite direction.  That
17   is, the patent holder pays the alleged infringer to stay out of the market—an unlawful agreement
18   in restraint of trade.

19       3.    Dexilant is a treatment for erosive esophagitis and symptoms of gastroesophageal
20   reflux disease, also known as GERD.

21       4.    Since 2009, Takeda has sold brand Dexilant in the United States and generated
22   billions of dollars in revenue from such sales.

23       5.    Beginning in 2010, generic pharmaceutical manufacturers began filing
24   applications with the U.S. Food and Drug Administration ("FDA") seeking approval to market
25   and sell generic versions of Dexilant to compete with Takeda's brand product.

26       6.    Takeda filed multiple lawsuits to stop this competition, claiming that these generic
27   manufacturers would infringe one or more of Takeda's patents for the drug.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

7.    Three of Takeda's lawsuits—against generic manufacturers TWi, Par Pharmaceutical Inc. ("Par"), and Impax Laboratories, LLC ("Impax")—were consolidated and proceeded to trial in 2013.

8.    The trial court judge in that case—the Honorable Joseph Spero of this district— ruled in favor of the generic manufacturers with respect to certain patents and in favor of Takeda with respect to others.  Judge Spero held that TWi's generic would infringe a single patent—U.S. Patent No. 7,737,282 ("'282 patent")—which had an expiration date of June 15, 2020.  *See Takeda Pharm. Ltd. v. TWi Pharms., Inc.*, No. C-11-01609 JCS, 2013 WL 12164680 (N.D. Cal. May 5, 2013) ("Spero SJ Op.").  In a subsequent opinion, he held that Par and Impax would infringe the '282 patent as well as other patents with later expiration dates and rejected challenges to the validity of the '282 patent.  *See Takeda Pharm. Co., Ltd. v. Handa Pharms.*, Inc., No. C-11-00840 JCS, 2013 WL 9853725 (N.D. Cal. Oct. 17, 2013) ("Spero F&C").

9.    On May 29, 2013, Takeda filed an additional lawsuit against Impax and TWi, among others, alleging that their generic Dexilant products would infringe U.S. Patent No. 8,173,158 ("'158 patent").  On July 9, 2013, Takeda amended its complaint against TWi to add an infringement claim concerning U.S. Patent No. 8,461,187 ("'187 patent").  Later, it filed a second amended complaint alleging infringement of the '158 and '187 patents.  The actions against Par, Impax, TWi and others were related and assigned to former District Judge Koh.  *See Par Pharm., Inc. v. Takeda Pharm. Co., Ltd.*, No. 13-CV-01927- LHK, 2013 WL 12221673 (N.D. Cal. Oct. 28, 2013).

10.    On April 10, 2015, Judge Koh granted in part and denied in part the parties' summary judgment motions.  *See Takeda Pharm. Co., Ltd. v. TWi, Inc.*, 87 F. Supp. 3d 1263 (N.D. Cal. 2015) ("Koh SJ Op.").  Specifically, she granted TWi's motion with respect to noninfringement of the '158 patent under the doctrine of equivalents and denied Takeda's motion regarding TWi's affirmative defense of inequitable conduct as to the '187 patent.  Following the decision, the parties proceeded to trial on whether their generic products would literally infringe

the asserted patents, their potential invalidity and unenforceability, and inequitable conduct on the part of the inventors in procuring the '187 patent.

11.    On April 27, 2015, a few weeks after oral argument in the Federal Circuit and shortly after Judge Koh ruled that the evidence presented to her was sufficient to allow a reasonable fact finder to conclude that the '187 inventors intended to deceive the PTO, Takeda and TWi settled, entering into the Agreement.

12.    At the time of the Agreement, TWi had strong arguments that were likely to prevail in all its cases against Takeda.  Discovery had shown that the product ultimately introduced as Dexilant was already in human testing at the time inventors of the '187 and '158 patents swore that they had first invented the subject matter of those patents and had been disclosed in U.S. Patent No. 7,790,755 ("'755 patent") before the filing of either of the '187 or '158 patents.  TWi was likely to prevail on a number of its arguments including that the patents were not novel and were anticipated by the prior art and, as to the '187 patent, that Takeda had deliberately misled the United States Patent and Trademark Office ("PTO") about the existence of such prior art.

13.    TWi filed an appeal to the Court of Appeals for the Federal Circuit with respect to the '282 patent, the only patent that it had been found to infringe and had a strong argument for reversing that loss.  As explained below, during oral argument in March of 2015, one of the judges on the Federal Circuit panel expressed the view that Judge Spero had committed reversible error in failing to find the '282 patent to be invalid as anticipated or rendered obvious by the prior art.

14.    Even assuming the trial court rulings were all affirmed, TWi would have been able to enter the market in June of 2020, when the '282 patent was set to expire.  TWi would have been able to launch before Par and Impax, which had forfeited their right to exclusivity as the first to file Abbreviated New Drug Applications ("ANDA") with respect to specific Dexilant strengths by failing to obtain timely tentative FDA approval and had additional patent obstacles from the trial rulings.

15.     Rather than compete, Takeda made a reverse payment to TWi to unlawfully prolong Takeda's monopoly.

16.     Specifically, on or around April 27, 2015, Takeda and TWi reached an anticompetitive agreement in which TWi agreed to delay its generic version of Takeda's Dexilant product until January of 2022, approximately 18 months after the expiration date of the '282 patent, the single Dexilant patent blocking TWi from the market.  For refraining from competing with brand Dexilant, Takeda paid off TWi in at least two ways.

17.     First, Takeda paid TWi $9.5 million in cash.

18.     Second, Takeda granted TWi exclusive rights to distribute the authorized generic ("AG") version of Dexilant or its own Abbreviated New Drug Application ("ANDA") product. Takeda knew that TWi would choose to distribute the AG because it would ensure that only one generic version of the drug came to market rather than two.  In effect, Takeda granted TWi a monopoly on generic sales of Dexilant and agreed not to compete with TWi with its own AG when TWi was finally permitted to enter the market in 2022.

19.     In accordance with this unlawful agreement, TWi waited until January 2022 to begin selling the AG Dexilant product, and as agreed, TWi had the generic market to itself for nearly a year.

20.     Bora joined this unlawful Agreement when it acquired TWi in October of 2022, with knowledge of and support for it. Upsher joined this unlawful Agreement when it was acquired by Bora in July of 2024 and merged with, and became the successor to, TWi.

21.     The Agreement was a win-win for both Takeda and TWi, and later, Bora and Upsher.  Takeda benefited by prolonging its monopoly until 2022, which allowed it to avoid generic competition and charge supracompetitive prices for brand Dexilant during that time.  TWi benefited because, when it eventually entered the market, it was able to sell generic Dexilant without competition from other generics for nearly a year.

22.     Conversely, the Agreement was a lose-lose for Plaintiff and other direct purchasers of brand and generic Dexilant, who were overcharged on (i) brand Dexilant purchases when they

would have otherwise been able to purchase lower priced generic Dexilant by about mid-2020; and (ii) generic Dexilant purchases that were overpriced because of TWi's exclusivity and delayed generic competition.

23.    The foregoing scheme was consistent with a broader effort by Takeda during this time period to unlawfully thwart generic competition against its brand products.  For example, approximately seven months before agreeing to the Agreement here, Takeda entered into an agreement with Par concerning a different Takeda drug called Amitiza.  The Amitiza agreement is alleged to contain similar pay-for-delay terms that have been challenged in a separate ongoing lawsuit, and the court there has ruled that the agreement's terms plausibly establish a claim for an antitrust violation.[1]  In addition, within a year of Defendants' Agreement, Takeda was at it again, allegedly orchestrating agreements with multiple generic manufacturers to inhibit competition with its brand drug Colcrys.  The Colcrys agreements also resulted in antitrust litigation.  Takeda settled this case during trial after Takeda's motions to dismiss and summary judgment were denied in part.

24.    This lawsuit seeks overcharge damages and related relief to redress Defendants' unlawful conduct, which prevented free and fair competition and caused Plaintiff to pay substantial overcharges on both brand and generic Dexilant.

## II.    PARTIES

25.    Plaintiff CVS Pharmacy, Inc. ("CVS") is a Rhode Island corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895.  CVS purchases substantial quantities of pharmaceutical products and other goods for resale to the public through more than 9,000 drugstores, approximately eleven mail service pharmacies, and twenty-seven specialty pharmacies owned and operated by its affiliates.  CVS brings this Action on its own behalf and as the assignee of McKesson Corporation and Cardinal Health, Inc., which during the relevant period each purchased brand and generic Dexilant directly from Defendants for resale to CVS, and has subsequently expressly assigned its claims arising out of those purchases to CVS.

---

[1] *See In re Amitiza Antitrust Litig*., 2022 WL 17968695, at *1-2 (D. Mass. Dec. 27, 2022).

26.     Defendant Takeda Pharmaceutical Company Limited ("Takeda Japan") is a Japanese corporation having its global headquarters and a principal place of business at 1-1, Nihonbashi-Honcho 2-Chome, Chuo-ku, Tokyo 103-8668, Japan.  Takeda Japan owns and controls Defendants Takeda Pharmaceuticals U.S.A., Inc. ("Takeda U.S.A.") and Takeda Pharmaceuticals America, Inc. ("Takeda America").  Defendants Takeda Japan, Takeda U.S.A. and Takeda America were all parties to the unlawful settlement agreement with the TWi entities described below.

27.     Takeda U.S.A. and Takeda America's current principal place of business is at 95 Hayden Avenue, Lexington, Massachusetts 02421.  These entities have operations in the United States near Chicago, Illinois and in San Diego, California.

28.     As noted above, these three entities are referred to collectively herein as "Takeda."

29.     Defendant TWi Pharmaceuticals, Inc. ("TWi Pharmaceuticals") is a Taiwanese corporation having a principal place of business at 3F, No. 41, Ln. 221, Gangqian Rd., Neihu Dist., Taipei City 114, Taiwan (R.O.C.).  TWi Pharmaceuticals formerly owned and controlled TWi Pharmaceuticals USA, Inc. ("TWi USA"), with a principal place of business at 115 West Century Road, Suite 135, Paramus, NJ 07652.  As noted above, Defendants TWi Pharmaceuticals and TWi USA are referred to collectively herein as "TWi."

30.     Defendant Bora is a Taiwanese corporation having a principal place of business at 6F, No. 2, Aly. 36, Ln. 26, Ruiguang Rd., Neihu District, Taipei City, 114 Taiwan (R.O.C.).  In October of 2022, Bora acquired TWi.  In its press release on the acquisition, Bora said that "TWi Pharmaceuticals USA operations will remain a separate entity and be able to take advantage of Bora's existing large-scale production capacity and transfer some of the commercial manufacturing of its generic and [505(b)(2)] drugs in the United States to the certain Bora sites."[2]

---

[2] https://boracdmo.com/bora-expands-its-cdmo-capabilities-as-it-makes-landmark-acquisition-of-twi-pharmaceuticals/ (last accessed Aug. 28, 2025).  A 505(b)(2) drug is approved through a streamlined FDA regulatory approval process.  The process results in a new drug rather than a generic, but permits the applicant to use the existing safety and efficacy data of a previously approved drug.  The 505(b)(2) drug is often a modified version of a previously approved drug product.

Bora and TWi had been negotiating this deal for a period of time.  In the exercise of due diligence, Bora would have known of TWi's arrangement to sell an AG of Dexilant and would have also been aware of TWi's 2015 Agreement with Takeda, which it supported by consummating the acquisition.

31.    Bora has an ever-expanding presence in the United States.  As noted below, in 2024, it acquired the generic drug manufacturer Upsher, based in Minnesota.  Later that same year, it also acquired Emergent BioSolutions, a sterile manufacturing facility in Baltimore-Camden, Maryland.  Bobby Sheng ("Sheng"), the Chairman and CEO of Bora, said that this latter "transaction...demonstrates our commitment to our growth strategy and plans for expansion in North America. . . ."[3]  In 2024, Bora also announced a deal finalized in 2025 with Tanvex Biopharma, Ltd. ("Tanvex") to have that company acquire Bora Biologics, formerly a  wholly-owned subsidiary of Bora, that specializes in large molecule CDMO (contract development and manufacturing organization) in exchange for Bora obtaining 30.5% of Tanvex's total outstanding shares (thereby becoming its single largest shareholder) and having Sheng serve as the combined entity's Chairman.[4]  Tanvex rechristened itself "Bora Biologics" and operates out of San Diego.

32.    Defendant Upsher is a Minnesota corporation with a principal place of business at 6701 Evenstad Drive, Maple Grove, Minnesota 55369.  Upsher reported that "[i]n April 2024, Bora Pharmaceuticals acquired Upsher-Smith, leading to [Upsher's] merger with TWi Pharmaceuticals in July 2024.  This strategic move allowed [Upsher] to incorporate TWi's products into [Upsher's] extensive portfolio (https://www.upsher-smith.com/products/).  By uniting [its] diverse product range with TWi's specialized R&D capabilities, [Upsher was] set to fuel [its] pipeline and elevate product development to new heights.  This integration not only enhance[d its] ability to deliver innovative solutions but also reinforce[d its] commitment to

---

[3] https://bora-corp.com/bora-to-acquire-first-sterile-manufacturing-facility (last accessed Aug. 28, 2025).

[4] https://bora-corp.com/bora-pharmaceuticals-makes-a-strategic-investment-into-tanvex-to-provide-global-biomanufacturing-services/ (last accessed Aug. 28, 2025).

1    improving patient outcomes and advancing healthcare."[5]  By merging with TWi, Upsher became

2    fully aware of and supported TWi's Agreement with Takeda.

3        33.    Bora's Chairman and CEO, Bobby Sheng, reiterated this theme: "Upsher-Smith's

4    platform for specialty generics will strengthen TWi's advantage in the US commercial sale

5    business with a complementary portfolio and differentiated distribution channels.  We are

6    confident, and also committed, to deliver another successful integration for accelerating Bora's

7    expansion and growth in the market."[6]

8        34.    All of Defendants' wrongful actions described in this complaint are part of, and in

9    furtherance of, the illegal monopolization and restraint of trade alleged herein, and were

10   authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or

11   other representatives while actively engaged in the management of the Defendants' affairs (or that

12   of their predecessors-in-interest) within the course and scope of their duties and employment,

13   and/or with the actual, apparent, and/or ostensible authority of the Defendants.

14                    **III.    JURISDICTION AND VENUE**

15       35.    This action arises under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2,

16   and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and Plaintiff seeks to recover threefold

17   damages, costs of suit and reasonable attorneys' fees for the injuries sustained by Plaintiff

18   resulting from Defendants' conspiracy to restrain trade and Takeda's monopolization of the

19   relevant market.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

20       36.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C.

21   § 1391(b) because during the relevant period, Defendants were found and transacted business in

22   this District, and a substantial portion of the events and omissions underlying this action occurred

23   in this District.

24

25

26   [5] https://www.upsher-smith.com (last accessed Aug. 28, 2025).

27   [6] https://www.upsher-smith.com/news/bora-pharmaceuticals-to-acquire-us-pharma-manufacturer-upsher-smith-for-210-million-in-transaction-to-fuel-global-expansion/ (last accessed Aug. 28,

28   2025).

37.    The drugs at issue in this case are sold in interstate commerce and Defendants' conduct as described in this Complaint, occurred in and had a substantial effect on interstate commerce of the United States, including in this district.

38.    During the relevant period, Takeda and TWi (and now Bora and Upsher) manufactured, sold and shipped Dexilant and/or generic Dexilant capsules in a continuous and uninterrupted flow of interstate commerce.  The conspiracy in which Defendants participated, and Takeda's monopolization of the dexlansoprazole market, had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

39.    During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy or to monopolize the dexlansoprazole market.  This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the United States including in this District.  The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    BACKGROUND

### A.    New Drug Applications and the Listing of Patents in the FDA's Orange Book

40.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[7] brand drug manufacturers that wish to sell a new drug product must obtain FDA approval by filing a New Drug Application ("NDA").[8]  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as information on applicable patents that cover the drug or its approved use.[9]

---

[7] 21 U.S.C. §§ 301 *et seq.*

[8] 21 U.S.C. §§ 301-392.

[9] 21 U.S.C. §§ 355(a), (b).

COMPLAINT AND DEMAND FOR JURY TRIAL

41.    The FDA approves new drugs if clinical trials submitted by the applicant establish that the drugs are safe and effective to treat a particular indication.  New drug applicants are not required to, and usually do not try, to show that their new drug products are superior to similar products previously approved for the same indication.

42.    Following approval of a brand manufacturer's NDA, the applicant must provide certain patent information to be listed in an FDA publication entitled Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the "Orange Book."  The information submitted must include the patent number and expiration date of each patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent manufactured, used, or sold the drug and that: (a) claims the drug for which the applicant submitted the application and is a drug substance (active ingredient) patent or a drug product (formulation or composition) patent or (b) claims a method of using such drug for which approval was granted in the application. [10]  If a manufacturer obtains a new patent after the FDA has approved an NDA, it must direct FDA to list that patent in the Orange Book within thirty days of issuance.[11]

43.    The FDA relies completely on the brand manufacturer's truthfulness in submitting patents to be listed, as it does not have the resources or authority to verify the validity or relevance of the manufacturer's patents.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

44.    As described further below, when a patent is (properly) listed in the Orange Book, a brand manufacturer may sue a generic company for infringing that patent before the generic product is sold.  If it does, the FDA cannot approve the generic manufacturer's drug application for thirty months.[12]

---

[10] 21 U.S.C. §§ 355(b)(1)(A)(viii).

[11] 21 U.S.C. §§ 355(b)(1), (c)(2).

[12] 21 U.S.C. §§ 355(c)(3)(C), (j)(5)(B)(iii).

45.     Here, the '282 patent was never listed in the Orange Book, and TWi raised that failure as one of the issues on its appeal of Judge Spero's rulings to the Court of Appeals for the Federal Circuit.

**B.     The Limits of Patent Protection for Drugs**

46.     The existence of one or more patents purporting to claim a drug substance or drug product does by itself give a brand drug company an enforceable monopoly over the drug. Patents are routinely invalidated or held unenforceable upon reexamination or *inter partes* proceedings by the U.S. Patent and Trademark Office ("PTO"), by court decision, or by jury verdict.

47.     As discussed in greater detail below, under the framework of the Drug Price Competition and Patent Term Restoration of 1984 (the "Hatch-Waxman Act"), a generic drug company filing an ANDA can challenge patents listed in the Orange Book as covering the brand drug by providing notice to the brand manufacturer that it believes the listed patents to be invalid, unenforceable, or not infringed by its generic product.  If the brand manufacturer commences a patent infringement lawsuit within 45 days of the generic drug company's notice, the FDA cannot approve the generic drug for 30 months.[13]

48.     At all times, a patent holder bears the burden of proving infringement.

49.     One way that a generic can prevail in patent infringement litigation is to show that the patent holder cannot meet its burden to prove infringement.  Another is to show that the patent is invalid or unenforceable.

50.     A patent is invalid or unenforceable when, *e.g.*, (i) the disclosed invention is anticipated or obvious in light of earlier prior art;[14] (ii) an inventor, an inventor's attorney, or

---

[13] 21 U.S.C. § 355(j)(5)(B)(iii).

[14] A non-exhaustive list of other circumstances less relevant to this case that can invalidate or otherwise render a patent unenforceable include failure to name the correct inventors, failure to adequately describe and claim the invention, and failure to pay required maintenance fees to the PTO.  Licenses and ownership transfers can render a patent unenforceable against a particular infringer, and laches and estoppel can apply when a patent holder delays filing suit against a known infringer too long.  Lastly, the patent can be unenforceable because its term has expired.

another person involved with the application, with intent to mislead or deceive the PTO, fails to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution; and/or (iii) a later-acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as a terminal disclaimer, applies).

51.    In these circumstances, the PTO's grant of a patent does not preclude a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit, or (iii) whether a patent may be "reasonably asserted" against a competitor or otherwise properly listed in the Orange Book.

52.    Statistically, in pharmaceutical patent litigation, it is more likely that a challenged patent will be found invalid or not infringed than upheld.  The Federal Trade Commission ("FTC") reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[15]  An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reported that generic challengers win 74% of the time in pharmaceutical patent cases that are fully litigated on the merits.[16]

53.    If a generic manufacturer successfully defends against the brand's infringement lawsuit—either by showing that its proposed generic product does not infringe any asserted patents and/or that any asserted patents are invalid or unenforceable—the generic may enter the market immediately upon receiving approval from the FDA.

---

[15] FTC, GENERIC DRUG ENTRY PRIOR TO PATENT EXPIRATION: AN FTC STUDY, vi-vii (2002), *available at* https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf (last accessed Aug. 28, 2025).

[16] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged from . . . nearly a decade ago."), *available at* http://texaslawreview.org/wp-content/uploads/2015/08/AllisonEtAl-92-7.pdf (last accessed Aug. 28, 2025).

**C.      Regulatory Approval of Generic Drugs**

54.      In the Hatch-Waxman Act, Congress reduced the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs to launch generic versions of brand name drugs.  Pursuant to the Hatch-Waxman Act, a drug company that wants to sell a generic version of an approved brand name drug must file an Abbreviated New Drug Application ("ANDA") with the FDA.

55.      To expedite the availability of affordable generic drugs, Congress determined that generic drug manufacturers do not have to establish the safety and efficacy of the generic versions of previously approved brand drugs, because the safety and efficacy of the brand drugs were established by the brand manufacturer at the NDA approval stage.

56.      Instead, an ANDA applicant must show that the drug product described in the ANDA is bioequivalent to or "the same as" the brand drug.[17]  That is, the ANDA applicant must prove only that the active ingredient of the generic product is the same as the active ingredient of the listed drug, and the conditions of use, route of administration, dosage form, strength, rate and extent of absorption and—with certain permissible differences—labeling are the same as those of the reference listed drug.

57.      If it does so, the ANDA applicant may rely on the FDA's previous finding that the brand drug product is safe and effective because—as a matter of good science and decades of experience—there is no reason to believe that the generic product would behave differently in the body than the brand product.  If a generic application establishes bioequivalence to the brand drug, the FDA assigns the generic drug an "AB" rating for tablet and capsule dosage forms.

58.      The FDA has considerable flexibility in determining how the bioequivalence requirements are satisfied.

**D.      The Paragraph IV Certification Process**

59.      To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman

---

[17] *See* 21 U.S.C. § 355(j)(2)(A).

Act, it must make one of four certifications: (i) that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification"); (ii) that the patent for the brand drug has expired (a "Paragraph II certification"); (iii) that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or (iv) that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").[18]

60.     If a generic manufacturer files a Paragraph IV certification, it must notify the brand manufacturer and provide the brand manufacturer with detailed information explaining why the proposed generic does not infringe the listed patents and/or why the patents are invalid or unenforceable.[19]   The brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement of one or more of the listed patents.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval of the ANDA until the earlier of: (i) the passage of 30 months, or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[20]  However, the brand manufacturer must have a good faith belief that the patents subject to the Paragraph IV certification are or will be infringed by the marketing of the generic product.  While a generic manufacturer must certify to all the patents listed in the Orange Book, the brand company may sue for infringement on less than all.  Brand manufacturers often add additional patents to the Orange Book for the brand product after litigation has commenced.  While the generic must make one of the certifications to these later listed patents and may be sued for patent infringement of these later listed patents, the later lawsuits do not give rise to additional 30-month stays of FDA approval of the generic product.

---

[18] 21 U.S.C. § 355(j)(2)(A)(vii).

[19] 21 U.S.C. § 355(j)(2)(A)(iv)(III).

[20] 21 U.S.C. § 355(j)(5)(B)(iii).

61.     Until the 30-month stay expires or a court decides that the patent is invalid or not infringed, the FDA cannot grant final approval of the ANDA to authorize the generic manufacturer to market its product.  During this time, the FDA may grant "tentative approval." "Tentative approval" means that the ANDA product would otherwise be ready for final approval but for the 30-month stay blocking final approval.

**E.      The 180-Day Exclusivity Period for the First-Filer Generic**

62.     To encourage manufacturers to seek approval of generic versions of brand drugs, the Hatch-Waxman Act grants the first generic manufacturer who files an ANDA with a Paragraph IV certification (the "first-filer") a 180-day period to market the generic version of the drug, during which time the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand drug.

63.     When a first-filer files a substantially complete ANDA with a paragraph IV certification, the FDA cannot approve a later generic company's ANDA until that first-filing generic has been on the market for 180 days or the first-filer exclusivity has been forfeited.  The 180-day window is referred to as the first-filer's six month or 180-day "exclusivity" period.

64.     However, during this exclusivity period, a brand drug manufacturer (such as Takeda) can launch what is called an authorized generic or unbranded version of its own brand drug, under its NDA.  Brand companies frequently do so in response to actual or anticipated generic entry in order to recoup some of the sales they would otherwise lose to a generic product.

65.     To be eligible for the 180-day first-filer exclusivity, an ANDA applicant must: (i) file the first substantially complete ANDA, (ii) challenge the brand's patent(s) with a paragraph IV certification, and (iii) obtain tentative approval within 30 months (two and a half years) of filing.

66.     If a first-filer does not obtain tentative approval within 30 months of filing its ANDA (with one exception), it forfeits its 180-day exclusivity.[21]

---

[21] 21 U.S.C. § 355(j)(5)(D)(i)(IV).

67.    A first-filer can also forfeit exclusivity if: (i) a later filer receives a final judgment that its proposed ANDA product either does not infringe the patents certified against by the first filer or the patents are invalid; and (ii) the first filer fails to market before 75 days have passed from a judgment from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken.[22]

**F.    The Competitive Effects of AB-Rated Generic Competition**

68.    Generic versions of brand drugs contain the same active ingredient as the listed drug and are considered by the FDA to be just as safe and effective as their brand counterparts. The only material difference between generic drugs and their corresponding brand versions is their price.

69.    Experience and economic research show that the first generic manufacturer to launch prices its product below the prices of its brand counterpart.[23] Every state either requires or permits a prescription written for the brand drug to be filled with an AB-rated generic.  Thus, the first generic manufacturer almost always captures a large share of sales from the brand version of the drug.  Because the generic price is lower than the brand price, the average price of the drug at issue (brand and AB-rated generic combined) falls after the generic launch.

70.    If the brand does not launch an AG to compete against the first ANDA generic to launch, the generic price would be expected to be higher than if there were additional price competition from the AG.  Thus, the first ANDA generic to launch earns much more in sales and profits absent the launch of an AG than if it had to face competition from an AG.

---

[22] 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA).

[23] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at ii-iii, vi, 34 (Aug. 2011) ("FTC 2011 AG Study"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (last accessed Aug. 28, 25 2025); FTC Staff Study, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 1, *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last accessed Aug. 28, 2025).

71.     Once multiple generic competitors enter the market, the competitive process accelerates.  Multiple generic sellers typically compete vigorously with each other over price, driving prices of the generic drug down toward marginal manufacturing cost.

72.     Soon after generic competition begins, the vast majority of the brand's sales shift to generic sellers.  In a report by the Federal Trade Commission ("FTC") issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months following generic launch.[24]  Ultimately, the brand will only keep a small fraction of its sales prior to generic entry.

73.     The FDA has reported that generic drugs saved the United States healthcare system nearly $2.2 trillion from 2009 to 2019.  In 2022, the Office of Generic Drugs reported that the savings to consumers and the healthcare system during the first year after generic approval in 2018, 2019, and 2020 was approximately $53.3 billion.[25]

## G.     Authorized Generics

74.     As described above, a brand manufacturer may sell an AG at any time including during the first filer's exclusivity period.  An AG is the brand drug sold as a "lower cost" generic product typically through either the brand manufacturer's subsidiary (if it has one) or through a third-party distributor.  One study notes that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[26] Brand manufacturers sometimes begin selling AGs shortly before the first generic launches in order to secure multi-year purchase contracts with direct purchasers and load the generic pipeline at the expense of the first-filer or other exclusive generic.

---

[24] FTC 2011 AG Study, at 66-67.

[25] Office of Generic Drugs 2022 Annual Report, *available at* https://www.fda.gov/drugs/generic-drugs/office-generic-drugs-2022-annual-report (last accessed Aug. 28, 2025).

[26] K. A. Hassett & R. J. Shapiro, *The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals*, SONECON, p. 3 (May 2007) *available at* https://www.sonecon.com/docs/studies/050207_authorizedgenerics.pdf (last accessed Aug. 28, 2025).

75.    Competition from an AG substantially reduces drug prices and the revenues of the first generic (especially if the first generic would otherwise be the sole generic entrant).

76.    The FTC found that AGs capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average.[27]  A first generic makes much less money when it faces competition from an AG because (a) the AG takes a large share of unit sales and (b) competition from the AG reduces generic prices.

## V.    ANTICOMPETITIVE AGREEMENTS BETWEEN DRUG COMPANIES

77.    Brand and generic manufacturers are typically competitors.

78.    Unfortunately, it is relatively common for brand and generic pharmaceutical manufacturers to conspire to maintain high prices, protect their profits, and split between themselves the enormous savings that increased generic competition would otherwise deliver to drug purchasers.

79.    One common scheme to accomplish this result is for the brand to pay the generic to delay generic entry.  Such deals are often referred to as "pay- for-delay," "exclusion payment," or "reverse payment" agreements.

80.    The form of the "reverse payment" from the brand to the generic can vary.  It can consist of direct monetary compensation or the grant of a period of exclusivity.  But the goal is always the same: to induce the generic manufacturer not to compete.

81.    Subsequent ANDA filers who enter, or expect to enter, after the initial entry of a conspiring first-to-file generic manufacturer have more modest financial expectations because they may have little or no expectation of any form of market exclusivity.  By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG).  Thus, the drug has already been, or is on its way to being, commoditized.

82.    Accordingly, it is often not profitable for such later entering generics to pursue their own challenges of an invalid or uninfringed brand patent.  Instead, they often simply accept

---

[27] FTC 2011 AG Study, at 139.

an entry date after expiration of the first filer's exclusivity or join the conspiracy between the brand manufacturer and the generic. This behavior furthers the harm to drug purchasers.

83. Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

84. In a typical reverse payment agreement, the brand manufacturer pays a generic manufacturer to: (i) delay or abandon market entry, and (ii) abandon the invalidity and unenforceability challenges to the brand manufacturer's patents. The brand manufacturer preserves its monopoly by paying some of its monopoly profits to the generic manufacturer, and the generic manufacturer agrees to delay marketing its product, allowing the brand manufacturer to have an extended monopoly period.

85. The size of the payment can be a proxy to assess the patent merits. As the Supreme Court observed in *FTC. v. Actavis, Inc.*, 570 U.S. 136, 157–58 (2013) ("*Actavis*"), "[t]he owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition." In other words, the Court went on, "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness[.]"

**A.    A Brand Manufacturer's Payment of Cash to a Generic Manufacturer to Stay Out of the Market Is One Example of a Reverse Payment**

86. The earliest reverse payments by brand manufacturers were simply cash payments made by the brand to the generic to end a lawsuit.

87. As a result of regulatory scrutiny, congressional investigations, and class-action lawsuits, reverse payments in cash are now relatively uncommon.

88. However, they do still happen, as demonstrated by Takeda's monetary payment to TWi in this case in exchange for TWi's delayed launch of a generic Dexilant.

B.    **"No AG" Agreements Are Another Form of a Reverse Payment
That Allow Brand and Generic Manufacturers to Share the Gains
From Conspiring**

89.    An agreement by a brand manufacturer not to market an AG version of the brand drug for some period of time—or to structure the settlement so that it would make no economic sense for the brand to launch an AG (*i.e.*, a *de facto* no-AG agreement)—can also constitute a reverse payment made to delay generic entry.

90.    A no-AG agreement or promise of generic exclusivity is economically equivalent to the promise of a cash payment. By refraining from launching an AG, the brand manufacturer forgoes the sales and revenues it otherwise would have made with its AG and correspondingly increases the revenues and profits of the generic company which is able to sell its product without generic competition.

91.    Absent a no-AG promise, it almost always makes economic sense for the brand manufacturer to begin marketing an AG as soon as (or sometimes weeks or months before) the first generic enters the marketplace.

92.    Competition from an AG has a drastically negative effect on the revenues of a first generic to launch. As discussed above, an AG typically takes a substantial volume of the first generic's unit sales and generates competition that reduces generic prices thereby delivering savings to drug purchasers.

93.    In light of this economic reality, the first generic may be willing to delay its entry into the marketplace in return for the brand manufacturer's agreement to forgo competing with an AG during an exclusivity period.

94.    The additional monopoly profits the brand manufacturer gains from the delayed onset of generic competition more than make up for the profits it forgoes by temporarily not competing with its AG. The brand manufacturer gains from the delayed onset of generic competition; the first generic gains from the absence of generic competition for a period of time after it launches.

95.     Conversely, drug purchasers, like Plaintiff here, lose.  The brand and generic manufacturers' reciprocal pledges not to compete harm purchasers in multiple ways.  First, the pact delays generic entry into the marketplace, thereby extending the time during which the more expensive brand is the only product on the market.  Second, the pact expressly bars (or is structured to disincentivize) the brand from marketing an AG during any 180-day or other exclusivity period.

96.     For the first generic, the difference between selling the only generic and competing against an AG can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales.  A no-AG pledge thus has the same economic effect as a payoff made in cash, with even greater anticompetitive consequences as it also limits competition once generic entry occurs.  As explained by the then-Chairman of the FTC:

> Because the impact of an authorized generic on first-filer revenue is so sizable, the ability to promise not to launch an AG is a huge bargaining chip the brand company can use in settlement negotiations with a first-filer generic. It used to be that a brand might say to a generic, "if you go away for several years, I'll give you $200 million." Now, the brand might say to the generic, "if I launch an AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[28]

97.     Courts agree that no-AG agreements are an anticompetitive form of payment actionable under *Actavis*.[29]

---

[28] FTC, *Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics* (June 24, 2009), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz.pdf (last accessed Aug. 28, 2025).

[29] *See In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 549-50 (1st Cir. 2016); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 719–20 (N.D. Ill. 2016); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069-71 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, 2014 WL 4988410, at *20-21 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. AstraZeneca AB*, 52 F. Supp. 3d 705, 709–10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

98.    When a brand manufacturer agrees to a no-AG clause in exchange for a generic's agreement to delay generic entry, the additional profits from delaying generic competition significantly outweigh any profit that could have been gained from selling an AG.  The brand manufacturer gains a longer period of monopoly profits by delaying the onset of generic competition, and the generic maintains higher generic sales and pricing during its exclusivity period.  Thus, no-AG agreements allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

99.    No-AG agreements need not be explicit to achieve their anticompetitive ends. According to the FTC, a "common" form of "possible compensation" to the settling generic is an agreement containing "a declining royalty structure, in which the generic's obligation to pay royalties is reduced or eliminated if a brand launches an authorized generic product."[30]  As the FTC has stated, "[t]his type of provision may achieve the same effect as an explicit no-AG commitment."[31]

100.    And as courts have observed, even an explicit reservation of the right to sell an AG "does not on its own preclude the existence of an implicit no-AG agreement" nor "directly contradict the existence of a no-AG agreement, given the possibility of either an implicit or oral agreement."[32]

## VI.    OPERATIVE FACTS

### A.    Takeda's Development and Sale of Dexilant

101.    Defendant Takeda U.S.A. is the registered holder of approved New Drug Application No. 22-287 for the manufacture and sale of the drug Dexilant (dexlansoprazole).

---

[30] FTC, Bureau of Competition, *Agreements Filed with the Federal Trade Commission under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003: Overview of Agreements Filed in FY 2017* (2018), at 2, *available at* https://www.ftc.gov/system/files/documents/reports/agreements-filed-federal-trade-commission-under-medicare-prescription-drug-improvement-modernization/mma_report_fy2017.pdf  (last accessed Aug. 28, 2025).

[31] *Id.*

[32] *Picone v. Shire PLC*, 2017 WL 4873506, at *9 (D. Mass. Oct. 20, 2017).

102.    Dexlansoprazole—marketed by Takeda under the trade name Dexilant—is a proton pump inhibitor ("PPI") used to treat all grades of erosive esophagitis, maintain the healing of esophagitis, and treat heartburn associated with GERD.

103.    Dexlansoprazole works through the reduction of stomach acid by blocking the final step of stomach acid production.  It is released in two stages, based on different acidity levels in the human gastrointestinal tract.

104.    The FDA approved 30 mg and 60 mg dosage forms of Dexilant on January 30, 2009.

105.    Takeda originally marketed dexlansoprazole under the name Kapidex.

106.    In or around March 2010, Takeda began marketing Kapidex under the name Dexilant to avoid potential confusion with two other medications.

107.    Dexilant generated significant revenue and profits for Takeda.  Dexilant sales grew from around $200 million annually in 2010 to over a billion dollars annually beginning in 2015 and nearly every year thereafter until generic dexlansoprazole launched in 2022.

**B.    Takeda's Patents, Orange Book Listings and ANDA Filings by Generic Manufacturers**

108.    Due to the large market for Dexilant, it was not long before generic pharmaceutical manufacturers began taking steps to launch generic versions of the drug.

109.    However, Takeda owned the following patents related to Dexilant:[33]

| U.S. Pat. No. | Title | Exp. Date | Listed in Orange Book |
|---|---|---|---|
| 7,737,282 ("'282 patent") | Benzimidazole Compound Crystal | 6/15/2020 | No |
| 6,462,058 ("'058 patent") | A novel crystal of (R)-2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridinyl]methyl]sulfinyl]-1H-benzimidazole or a salt thereof of the present invention is useful for an excellent antiulcer agent. | 6/15/2020 | Yes |
| 6,939,971 ("'971 patent") | Benzimidazole Compound Crystal | 6/15/2020 | Yes |
| 7,285,668 ("'668 patent") | Process for the Crystallization of (R)– or (S)-Lansoprazole | 6/15/2020 | Yes |
| 9,145,389 ("'389 patent") | Benzimidazole Compound Crystal | 6/15/2020 | Yes |
| 6,664,276 ("'276 patent") | Benzimidazole Compound Crystal | 1/30/2023 | Yes |
| 8,722,084 ("'084 patent") | Controlled Release Preparation | 10/15/2023 | Yes |
| 8,784,885 ("'885 patent") | Controlled Release Preparation | 10/15/2023 | Yes |
| 8,461,187 ("'187 patent") | Multi PPI Dosage Form | 1/17/2026 | Yes |
| 9,238,029 ("'029 patent") | Multi PPI Dosage Form | 1/17/2026 | Yes |
| 9,011,926 ("'926 patent") | Method for Producing Granules | 2/24/2026 | Yes |
| 7,790,755 ("'755 patent") | Controlled Release Preparation | 8/2/2026 | Yes |
| 8,105,626 ("'626 patent") | Granules Containing Acid-Unstable Chemical In Large Amount | 9/27/2026 | Yes |
| 8,871,273 ("'273 patent") | Method for Producing Granules | 1/11/2028 | Yes |
| 8,173,158 ("'158 patent") | Methods of Treating Gastrointestinal Disorders Independent of the Intake of Food | 3/17/2030 | Yes |
| 9,233,103 ("'103 patent") | Methods for Treating Heartburn, Gastric Bleeding or Hemorrhage in Patients Receiving Clopidogrel Therapy | 3/5/2032 | Yes |

---

[33] The expiration dates of some of Takeda's patents were extended because of patent term extensions following delays in regulatory approval and/or pediatric exclusivity extensions of six months.  For example, the '276 Patent, originally set to expire on June 15, 2020, received a patent term extension of 959 days, and a six-month pediatric exclusivity extension, extending its expiration date to July 30, 2023.

110.    Because Takeda listed most of these patents in the Orange Book for Dexilant, when potential generic competitors filed ANDAs for their generic Dexilant products, they were required to make one of the four patent certifications required for the listed patents.

111.    The first pharmaceutical company to file an ANDA and challenge Takeda's then-listed patents for the 60 mg generic dexlansoprazole product was Handa Pharmaceuticals, LLC ("Handa").  Handa filed its ANDA on August 25, 2010 with a Paragraph IV certification to Takeda's '058, '276, '971, '668, and '755 patents.  Because the '282 patent was not listed in the Orange Book as covering Dexilant, no patent certification for that patent was necessary.  Handa amended its ANDA to include the 30 mg product on January 10, 2011.  On March 12, 2012, Handa transferred its ownership and all rights to Handa's ANDA to Par.  On December 26, 2013, a little over three years after the ANDA was filed, FDA granted tentative approval to Par.  As explained above, FDA grants tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay or the expiration of a first filer's exclusivity.  Par's ANDA received final approval on April 19, 2017.

112.    Impax was the first pharmaceutical company to file an ANDA and certify against Takeda's then-listed patents for the 30 mg generic dexlansoprazole product.  Impax filed its ANDA on November 30, 2010 with a Paragraph IV certification to Takeda's '058, '276, '971, '668, and '755 patents.  Again, because the '282 patent was not listed in the Orange Book as covering Dexilant, no patent certification to that patent was necessary.

113.    Generic manufacturer Anchen Pharmaceuticals, Inc. ("Anchen") filed ANDAs for 30 mg and 60 mg generic dexlansoprazole, which it transferred to Defendant TWi in May 2011.  As with first-filers Par and Impax, TWi filed Paragraph IV certifications to Takeda's '058, '276, '971, '668, and '755 patents.  Like Impax and Handa, Anchen (and later TWi) was not required to file a patent certification to the '282 patent because it was not listed in the Orange Book.

114.    Other generic manufacturers similarly filed ANDAs for 30 and/or 60 mg dexlansoprazole that included Paragraph IV certifications.

1
2

### C.    Takeda's Infringement Suits Against Generic Manufacturers and the 2013 Trial Court Rulings

3

115.    In response to the ANDA filings for generic dexlansoprazole and the

4

accompanying Paragraph IV certifications, Takeda filed numerous patent infringement lawsuits

5

against TWi, Handa, Impax, and others.

6

116.    Over several months in early 2011, Takeda filed patent infringement actions

7

concerning the '282, '755, '058, '276, '971, and '668 patents against multiple generic

8

manufacturers, including Handa, Dr. Reddy's, Anchen, and Impax.

9

117.    On April 18, 2011, the court granted Takeda's motion to relate the Dr. Reddy's,

10

Anchen, and Impax litigations to the Handa action in front of Magistrate Judge Spero.  These

11

related actions are referred to as the "Judge Spero Actions."

12

118.    On May 18, 2011, Takeda amended its complaint in the action filed against

13

Anchen to add TWi as a defendant following TWi's acquisition of Anchen's ANDA.  The

14

complaint continued to assert infringement of Takeda's '058, '276, '282, '755, '971, and '668

15

patents under 35 U.S.C. §271(e)(2), including the non-Orange Book listed '282 patent, and

16

sought a declaratory judgment action for patent infringement of the same patents under 35 U.S.C.

17

§271(a)-(c).  Takeda subsequently dismissed Anchen from the action.

18

119.    On August 21, 2012, the Court granted Takeda's motion to add Par as a defendant

19

following Par's acquisition of Handa's ANDA.

20

#### 1.    The Judge Spero Actions

21

120.    On April 11, 2012, Judge Spero issued his Claim Construction Order construing

22

disputed claim terms found in one or more of the asserted patents.  With respect to the '755

23

patent, he ruled that the claims require that the active ingredient "begins to be released from the

24

tablet, granule, or fine granule at pH values within the range from 5.0 to 6.0." *Takeda*

25

*Pharmaceutical Co., Ltd. v. Handa Pharmaceuticals, LLC*, Nos. C-11-00840 JCS, C-11-1609

26

JCS, C-11-1610 JCS, 2012 WL 1243109, at *46 (N.D. Cal. April 11, 2012).  He also ruled, with

27
28

respect to the '282 patent, that "amorphous compound" means "a non-crystalline solid that lacks the long-range order characteristic of a crystal." *Id.* at *51.

121.    Following these rulings, Takeda conceded that TWi's ANDA did not infringe four of the patents it had asserted, and on November 16, 2012, the court entered a Final Judgment in TWi's favor that its ANDA did not infringe the '058, '276, '971, and '668 patents. *Final Judgment As To TWi Pharmaceuticals, Inc*., No. 3:11-cv-01609 JCS at *1 (N.D. Cal. Nov. 1, 2013).  The only litigation that remained against TWi was the infringement action for the '282 and '755 patents.

122.    Takeda narrowed its claims of infringement against the various generic defendants to eleven asserted claims from the five remaining patents—the '755, '282, '058, '276, and '971 patents.  Takeda asserted that: (i) the ANDA submitted by Handa and Par infringed claims 2, 4, and 6 of the '755 patent, claims 1 and 2 of the '282 patent and claims 2 and 3 of the '276 patent; (ii) the ANDA submitted by TWi infringed claims 2 and 4 of the '755 patent and claims 1 and 2 of the '282 patent; and (iii) the ANDA submitted by Impax infringed claims 2, 4 and 6 of the '755 patent, claims 1 and 3 of the '058 patent, claims 2 and 3 of the '276 patent, and claims 6 and 7 of the '971 patent.

123.    On November 27, 2012, TWi filed a motion for summary judgment as to the asserted claims of '755 and '282 patents, the only remaining patents asserted against it.

124.    On April 8, 2013, Judge Spero entered a summary judgment order in each of the three related cases.  The Court granted summary judgment of noninfringement of the '755 patent in favor of Handa/Par, TWi, and Impax because Takeda's own testing showed some release of the drug below the minimum pH threshold of 5.0 claim determined in the Claim Construction Order. Spero SJ Op. at *25-26.

125.    Based on his construction of amorphous compound as limited to solids of a non-crystalline form, Judge Spero granted summary judgment of infringement of the '282 patent by Handa/Par and TWi.  The court held that sufficient evidence existed that TWi's ANDA products

contained, or that it was more likely than not that they contained, amorphous dexlansoprazole. *Id.* at \*22.

126.    The court denied Handa/Par and TWi's motions as to the invalidity of the '282 patent as anticipated by prior art references from two inventors named Barberich and Larsson. The court found that it was undisputed that the Barberich reference disclosed the "salt thereof" component of claim 1.  Because the patent disclosed a solid amorphous compound of dexlansoprazole, a person skilled in the art would have known how to obtain a salt thereof, and a salt obtained from a solid amorphous compound would also be a solid.  However, the court determined that a factual dispute remained as to whether the Barberich reference provided enough information for a person of ordinary skill in the art to create a salt of an amorphous compound of dexlansoprazole without undue experimentation, *i.e.*, whether Barberich provided an enabling disclosure for purposes of anticipation. *Id.* at \*23.

127.    Judge Spero also granted Takeda's motion for summary judgment of infringement of the '058, '276, and '971 patents by Impax and denied Impax's cross-motion as to noninfringement of claims 1 and 3 of the '058 patent and claim 7 of the '971 patent.  In doing so, Judge Spero rejected Impax's claim that the '971 patent lacked an adequate written description to support claims 6 and 7 of that patent. *See Takeda Pharm. Co. v. Impax Labs., Inc.*, 2013 WL 2384240, at \*6-18 (N.D. Cal. May 30, 2013).  Judge Spero also denied Handa/Par's motion of noninfringement as to the '276 patent, finding there to be a triable issue of fact. *Id.* at \*3 n.4.

128.    Judge Spero subsequently held a six-day bench trial that began on June 5, 2013, and concluded on June 12, 2013.  On October 17, 2013, the court issued Findings of Fact and Conclusions of Law, finding that: (i) Par's product infringed the '276 Patent; (ii) the '276, '058 and '971 Patents were not obvious in view of the prior art; (iii) the '282 Patent was not anticipated or obvious in view of the prior art, and did not lack sufficient written description; (iv) the Takeda entities had standing to assert the '282 Patent against TWi; and (v) Takeda could not assert the declaratory judgment action against TWi for infringement of the '282 Patent under §271(a). *See* Spero F&C at \*75.

129.    At the trial, TWi presented evidence that the '282 Patent was invalid as anticipated by or obvious over prior art.  TWi described the evidence in its appellate brief:

> Takeda concedes that the '282 patent's asserted claims are anticipated by the prior art Larsson and Von Unge references, unless the claim term "amorphous" is construed as limited to *solid* compounds.  There is no "clear indication in the intrinsic record" justifying limiting the term to just solids. *E.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).  Takeda does not contest its own expert's testimony that the "plain and ordinary meaning" of amorphous includes nonsolids.  (A1985; A1989.)  Rather, Takeda admits that the extrinsic evidence shows that the term "amorphous" can be used to refer to liquids, but argues that it "typically" refers to solids. (Red Bf. 18–19.)  That is not enough to limit the claims to solids, because claims are not limited only to what is "typically" used. *E.g., Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1374 (Fed. Cir. 2006).
>
> Even if limited to only solids, the asserted claims of the '282 patent are invalid in view of the prior art Barberich reference, either alone or in combination with the other prior art. Only Takeda's argument in the District Court that Barberich was not enabled stood in the way of a holding of invalidity.  But on appeal, in an attempt to deflect from its patent's written description problems, Takeda has conceded that "it is undisputed that a person of ordinary skill in the art could create a salt of an amorphous compound of dexlansoprazole (which must be solid under the Court's claim construction) based on the disclosure in Barberich." (Red Bf. 27.)  That disposes of Takeda's ability to argue nonenablement of Barberich.  Furthermore, the prior art taught three ways to make the solid amorphous solid dexlansoprazole disclosed by Barberich.  Takeda myopically focuses its comments on the alleged difficulty in literally following the procedure in the Larsson reference.  However, any procedure available in the prior art is sufficient.  *E.g., Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381 (Fed. Cir. 2003).  Moreover, the law embraces adaptations within the skill in the art. *E.g., In re Lamberti*, 545 F.2d 747, 750 n.2 (CCPA 1976).[34]

130.    As a result of the court's final judgments, TWi could not obtain approval of its ANDA until the expiration of the '282 Patent, on June 15, 2020.  Impax and Par could not obtain

---

[34] TWi Pharm., Inc.'s Response and Reply Brief, *Takeda Pharm. Co. Ltd., et al. v. TWi Pharma., Inc.*, Appeal Nos. 14-1074, 14-1129 (Fed. Cir. Nov. 24, 2014).

approval until December 20, 2020 because they were found to infringe patents in addition to the '282 patent (for Impax, the '058, '276, and '971 Patents; and for Par, the '276 Patent). These later expiring patents were also subject to further patent term extensions under review at the PTO.

131.    The Judge Spero Actions thus resulted in the following:[35]

| U.S. Pat. No. | Issue Date | Exp. Date | TWi (Anchen) | Handa/Par | Impax (Amneal) |
|---|---|---|---|---|---|
| **'058 Patent Family – Benzimidazole Compound Crystal** | | | | | |
| '058 patent | 10/8/2002 | 12/15/2020* | Takeda conceded no infringement | Lost at trial | Lost at trial |
| '276 patent | 12/16/2003 | 7/30/2023*[36] | Takeda conceded no infringement | Lost at trial | Lost at trial |
| '971 patent | 9/6/2005 | 12/15/2020* | Takeda conceded no infringement | Lost at trial | Lost at trial |
| '282 patent | 6/15/2010 | 6/15/2020 | Lost at trial | Lost at trial | Lost at trial |
| **'688 Patent Family – Process for Crystallization of (R)- or (S)-lansoprazole** | | | | | |
| '668 patent | 10/23/2007 | 12/15/2020* | Takeda conceded no infringement | | |
| **'755 Patent Family – Controlled Release Preparation** | | | | | |
| '755 patent | 9/7/2010 | 2/02/2027* | SJ no infringement | SJ no infringement | SJ no infringement |

132.    Absent a reversal on appeal, the earliest TWi could come to market was upon expiration of the '282 Patent on June 15, 2020, and Par and Impax were blocked until at least December 20, 2020. TWi effectively leapfrogged Par and Impax in its ability to come to market. Par and Impax were barred from launching by the additional patents that they were found to

---

[35] Asterisks in this chart indicate that the expiration date includes pediatric exclusivity.

[36] Takeda received a patent extension under 35 U.S.C. § 156. The PTO denied Takeda's request for a patent extension of the '058 and '971 patents.

infringe.  In addition, they forfeited their first-to-file exclusivity by failing to obtain tentative approval within 30 months of filing their ANDAs.

133.    Takeda recognized TWi's advantage compared to other generics.  In a post-trial press statement, it stated that "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."

### 2.    The Judge Koh Actions

134.    As noted above, the Judge Koh Actions were filed on May 29, 2013, shortly before the trial in the Judge Spero Actions began.

135.    On February 2, 2015, Takeda narrowed its asserted claims to seven: claim 1 of the '158 patent and claims 1, 2, 5, 6, 7, and 16 of the '187 patent.  These claims recite dosage forms for proton pump inhibitors ("PPIs") and were listed in the Orange Book for Dexilant after TWi (through Anchen) made its paragraph IV certification on Dexilant.

136.    On February 19, 2015, TWi moved for summary judgment on all four counts of Takeda's complaint.  It asserted that the '158 and '187 patents were invalid as a matter of law and, in the alternative, that Takeda could not prove infringement of the '158 patent, either literally or under the doctrine of equivalents.  TWi argued that the asserted claims of the '187 patent were anticipated by Takeda Japan's offer to sell TAK-390MR (the development code name for Dexilant) to TAP (a Takeda/Abbott Laboratories joint venture).  TWi asserted that the claims of both the '187 and '158 patents were anticipated by prior art.  Takeda simultaneously moved for summary judgment on TWi's affirmative defenses of inequitable conduct based on Takeda's representations to the PTO during the prosecution of the patents.

137.    On April 10, 2015, Judge Koh granted in part and denied in part the parties' summary judgment motions.  Specifically, she granted TWi's motion as to noninfringement under the doctrine of equivalents but otherwise denied it.  She further granted Takeda's motion regarding TWi's affirmative defense of inequitable conduct, as to the '158 patent, but denied it as to the '187 patent.  Koh SJ Op. at 1288.

138.   **On Sale Bar.**  Under then controlling patent law, an invention was not patentable "if the invention was patented or described in this or a foreign country, or in public use, or on sale in this country more than 1 year" before an application for patent is filed in the U.S. 35 U.S.C. §102(b) (2006).  TWi presented evidence that Takeda Japan offered to sell TAK-390MR to TAP.  Koh SJ Op. at *1272-77.  If TWi could prove by clear and convincing evidence that: (i) "the product [was] the subject of a commercial offer for sale;" and (ii) "the invention [was] ready for patenting," the '187 patent would be invalid.  The Offer Letter contained a "Supply Term" stating that "TAP shall purchase TAK390MR preparations from [Takeda Japan] until the last TAK390MR patent is expired."  TAP's legal counsel went further, stating that "[o]f course, we are certainly willing to state in the License Agreement that TAP will buy all of its requirements from Takeda if the parties later are able to arrive at a mutually acceptable price."  The Offer Letter contained other terms that, according to the court, were "indicative of an offer for sale," including "an initial payment of 3 billion Yen upon signing the license agreement, a royalty payment of 6% of net sales, and a transfer price per 60 mg capsule."  TAP's former CEO admitted that this document stated the price at which TAP "would buy the capsule…."  The Offer Letter also indicated that the transfer price would be the same for TAK-390MR as for Prevacid, which Takeda Japan was already selling to TAP.  The day after Takeda Japan made the Offer, Takeda Japan and TAP met in Chicago to discuss the offer, and both inventors of the '187 patent were present.  At that meeting Takeda informed TAP that Takeda had filed "the patents covering TAK- 390MR technologies."  Given this evidence, TWi was well positioned to succeed at trial to invalidate the '187 patent based on an offer of sale under 35 U.S.C. §102(b).

139.   **Lack of Novelty.**  TWi also had ample evidence that the '187 and '158 patents were anticipated by prior art, specifically the '755 patent ("Akiyama II") under §102(b).  Koh SJ Op. *1288.  Although Takeda disputed that Akiyama II was prior art to the '187 patent, it admitted that Akiyama II would anticipate the '187 patent if it were prior art.  The '187 patent claimed an earliest filing date of June 16, 2004.  Akiyama II's earliest filing date in the United States was derived from an international application filed in English on October 15, 2003, and

listing the United States as one of the applicable countries. The parties thus agreed that the earliest priority date of Akiyama II was October 15, 2003. The parties also agreed that Example 57 of Akiyama II disclosed TAK390-MR (i.e., Dexilant). TWi asserted, and Takeda's expert did not dispute, that construction.

140.    Example 57 meets every limitation of the asserted claims of the '187 patent. The only anticipation issue regarding the '187 patent was whether the inventors conceived of the '187 patent prior to October 15, 2003—at least eight months before they filed the application for the '187 patent—and more specifically, whether a single limitation in claim 1 of the '187 patent was anticipated, namely the limitation that the second dose of the drug contain at least 10% more of the drug than the first dose.

141.    TWi presented testimony from one of the inventors of the '187 patent that results from a study available on December 22, 2003, after Akiyama II, concerning the active ingredient's absorption from different segments of the gastrointestinal tract, led to the conception of the limitation in claim 1 that "the second dose contains at least 10% more PPI than the first dose," and each dose contains an amount of PPI that "raise[s] the plasma levels of the PPI above a threshold concentration of at least 100 ng/ml." In a declaration submitted in connection with summary judgment, a different inventor stated that the inventors had conceived of increasing the dose by at least 100% by March 2003, before Akiyama II, relying on a design of study to be conducted later, an investigation of site of absorption and blood level study. Takeda would not have prevailed by presenting this argument at trial. Under controlling Federal Circuit precedent cited by the court in connection with summary judgment, a "sufficiently generalized" conception of a species within the genus of the claim limitation does not constitute conception of the entire genus. While the study made an assumption in simulation of a 100% increase in the second dosage over the first, it is insufficient to support the "at least 10%" claim limitation under the standards applicable at trial. TWi would have prevailed in showing that the inventors had not conceived of this key claim limitation until after the priority date of Akiyama II, and thus the '187 patent was anticipated.

142.    Takeda did not dispute that Akiyama II was prior art to the '158 patent (filed in 2007) but disputed that Akiyama II anticipated claim 1 of the '158 patent.  The sole issue with regard to anticipation was whether Example 57 of Akiyama II anticipated the "regardless of whether the patient is under fasted or fed conditions" limitation in claim 1.  Akiyama II did not specify whether the drug should be administered with or without food, suggesting that the drug could be administered under fasted or fed conditions.  Takeda argued that a person of skill in the art reading Akiyama II would expect to administer the drug under fed conditions, but Takeda mainly relied on evidence from well after Akiyama II.  As a result, TWi would have prevailed on this issue at trial as well.

143.    ***Inequitable Conduct.***  The court also denied Takeda's motion for summary judgment on TWi's defense of inequitable conduct regarding the '187 patent, leaving this defense available to TWi at trial.  The inventors of the '187 patent affirmed in a declaration under oath to the Patent Office that they were the first to invent the subject matter of the '187 patent.  This affirmation was alleged to be false.  The inventors knew of the previous work regarding the Takeda product development of TAK-390MR and that TAK-390MR was already being tested in humans by Takeda at the time of their first alleged date of conception of their invention.  Thus, their affirmation to the PTO and their claim to be the first to invent the subject matter of the patent application more than a year later were known by the inventors to be subsequent to the work of Akiyama II.[37]

144.    TWi identified emails, presentations, meeting minutes, and deposition testimony establishing that the inventors of the '187 patent had extensive knowledge of the formulation, clinical data and clinical performance of TAK-390MR as early as May 2003.  The evidence showed that they had attended a Takeda presentation in May 2003 that demonstrated Takeda had already begun the administration of a TAK-390MR formulation to humans in early 2003.  The '187 inventors testified that they were surprised to see the data presented, and thought it was their

---

[37] Under then-controlling patent law, 35 U.S.C. § 102(e) described patent defeating activities by others that occurred in the U.S. or elsewhere before the applicant invented the subject matter or filed an application for the patent.

formulation; it was not. They received additional formulation and clinical data on TAK-390MR in August 2003 and March 2004. One of the inventors, who was also Takeda's Fed. R. Civ. P. 30(b)(6) witness regarding the conception and reduction to practice of the asserted claims, testified that results from a study available on December 22, 2003, led to the conception of the "at least 10%" limitation. In a declaration submitted in connection with summary judgment, a different inventor stated that the inventors had conceived of increasing the dose by at least 100% by March 2003, before the Akiyama II earliest filing date of October 15, 2003.

145.    Takeda argued that as of May 2003 the '187 inventors had planned a study to confirm the performance of their formulation, but the final report was not available until May 18, 2004, well after October 15, 2003, the earliest priority date of Akiyama II. *See id.* at *1273-74. Thus, there was strong evidence that a fact finder would conclude that the inventors of the '187 Patents were not the first to conceive the subject matter of the '187 Patent, that they knew they were not the first to conceive the subject matter, and that they knowingly filed a false declaration claiming that they were the first inventors. The knowing submission of a false declaration "raises a strong inference of intent to deceive." All of this could readily be shown at trial resulting in the invalidation of the asserted claims.

146.    Considering the evidence, Judge Koh acknowledged the force of this argument (*id.* at *1286) (emphases added):

> Construing the evidence in the light most favorable to TWi, a reasonable fact finder could conclude that the '187 Patent inventors knew that they **were not the first to invent, but submitted a declaration to the Patent Office stating otherwise.** The knowing submission of a false declaration "raises a strong inference of intent to deceive." *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1345 (Fed. Cir. 2013). Accordingly, the Court DENIES summary judgment of no inequitable conduct as to the '187 Patent.

147.    ***No Infringement Under the Doctrine of Equivalents and Other Koh Rulings.*** The court also held that Takeda could not rely on the Doctrine of Equivalents to prove infringement of the '158 patent, and that there was a genuine dispute of fact as to literal infringement of claim 1 of the '158 patent. The court stated that whether to grant summary

judgment as to the absence of literal infringement was a "close call" (Koh SJ Op. at *1280) suggesting the weakness of Takeda's arguments at the trial.

### 3. Non-litigated Patents

148.    Takeda's other patents purportedly reciting claims for Dexilant, including those listed in the Orange Book after the decisions of Judges Spiro and Koh and/or after the settlement Agreement, with an expiration date after June 15, 2020, would not delay generic entry.  It would have been easy for TWi to either design around or "carve out" the patent uses from its product label.  Additionally, TWi could have successfully advanced noninfringement, invalidity or unenforceability defenses to these patents similar to those it advanced against the '755, '187, and '158 patents.  Moreover, since the 2015 Agreement between Takeda and TWi, no other patents have been recognized by the parties as presenting any barrier to generic entry.  In any event, in their settlement agreement, Takeda and TWi also likely negotiated a license to all patents (including later- issued patents) covering the approved drug as is customary in pharmaceutical patent settlements.

### D. Takeda Resolved Each of Its Dexilant Patent Cases After the Initial Trial.

149.    Following the trial rulings, Par, TWi, and Impax all appealed the adverse aspects of Judge Spero's decision to the Court of Appeals for the Federal Circuit.  Takeda also cross-appealed the district court's determination that neither Par, TWi nor Impax infringed the '755 patent.

150.    TWi had a strong appellate challenge to the validity of the '282 patent, which was the only patent the district court found TWi had infringed.  TWi contended that the district court had misinterpreted the claim term "amorphous compound" by restricting it to non- crystalline solids.  There was no "clear indication in the intrinsic record" justifying limiting the term to just solids, and the Court recognized that Takeda did not contest its own expert's testimony that the "plain and ordinary meaning" of amorphous includes nonsolids.  Moreover, Takeda admitted that the extrinsic evidence showed that the term "amorphous" can be used to refer to liquids.  It only argued that it "typically" refers to solids.  Furthermore, TWi argued that even under the district

court's interpretation, the asserted claims were invalid in view of the prior art Barberich reference, either alone or in combination with other prior art.

151.    At oral argument before the Court of Appeals for the Federal Circuit on March 6, 2015, the appellate panel appeared to favor TWi's arguments about anticipation or obviousness. One of the judges suggested that Judge Spero's failure to consider the evidence on this topic might be "clearly erroneous" and inconsistent with the evidence.

152.    Conversely, there was very little discussion at the appellate argument of Takeda's appeal of Judge Spero's finding of noninfringement of the '755 patent.  This was unsurprising. Takeda's infringement claim was based on a request for a revised construction that the release of the operative drug in the patent must be significant and rapid.  Spero SJ Op. at *25.  The district court found that this argument ran contrary to its prior findings on claim construction and was disproved by the patent prosecution history itself.  *Id.* at *26.  Moreover, this interpretation ran afoul of Takeda's own testing of its drug.  Accordingly, Judge Spero ruled "as a matter of law that those [TWi's] products do not infringe the asserted claims of the '755 Patent."  *Id.* at *27. Thus, Takeda's chances of success on its appeal were minimal.

153.    All parties settled before the Court of Appeals for the Federal Circuit issued an opinion.

154.    Takeda settled with Par on or around July 18, 2014, and with Impax on or around October 16, 2014.

155.    Takeda's settlement with TWi took longer.  But on or around April 27, 2015, approximately seven weeks after oral argument before the Court of Appeals for the Federal Circuit, Takeda settled with TWi.

156.    Takeda's settlement with TWi also resolved the disputes concerning the '158 and '187 patents, thus suggesting that it realized its arguments as to those patents might well not pass muster before a jury.

157.    By the end of 2015, Takeda had settled its ongoing infringement actions against all generic manufacturers with ANDAs for Dexilant.

**E.     Takeda's Settlement With TWi Included an Unlawful "Reverse Payment" Agreement, Whereby TWi Delayed Its Market Entry in Exchange for Significant and Unjustified Compensation From Takeda**

158.    Takeda's settlement agreement with TWi included a "reverse payment" in violation of the antitrust laws.

159.    At the time of settlement in 2015, the only serious obstacle to entry that TWi faced was the '282 patent, which was set to expire on June 15, 2020.

160.    TWi had very strong arguments for a reversal of the trial court's ruling with respect to the '282 patent based on invalidity because prior art anticipated or rendered obvious the asserted claims in the patent.  More specifically, TWi presented strong arguments that the district court had misconstrued the claim term "amorphous compound" by limiting it to solids and that, as properly construed, the claims were anticipated by prior art.  TWi also presented strong arguments that even under the district court's claim construction, the claims were invalid for lack of written description and/or because the claims were anticipated or would have been obvious over prior art.

161.    Nor were the '158 and '187 patents likely to prevent TWi from launching for the reasons discussed above.

162.    Despite its strong appellate position, and the June 15, 2020 expiration date of the '282 patent, TWi agreed to delay the launch of its generic Dexilant product until January 2022— approximately 18 months after the expiration of the '282 patent.

163.    TWi agreed to this delay because Takeda made a large and unjustified payment to TWi.

164.    First, Takeda paid TWi $9.5 million as part of the agreement.  TWi expressly acknowledged receipt of the payment in an annual financial report stating:

> On April 27, 2015, the Company and Takeda Pharmaceutical Company Limited and its American Subsidiaries (individually and collectively "Takeda") entered into a settlement agreement with regards to pending patent litigations.  ***In accordance with the terms of the agreement, Takeda paid the Company US$9,500 thousand.*** (emphasis added).

165.    This payment far exceeded any reasonable estimate of Takeda's saved future litigation expenses.  By the time of the payment, the core claims had already been tried before the district court and fully briefed and argued to the appellate court.  Moreover, while Takeda had filed a separate case against TWi regarding two other patents, at the time of the settlement, the issues in that later filed case had been considerably narrowed through an order resolving cross motions for summary judgment.

166.    Second, and entirely apart from the $9.5 million cash payment, Takeda paid TWi by effectively granting TWi a monopoly on sales of generic Dexilant—the economic equivalent of a no-AG agreement.

167.    Under the terms of the Agreement, Takeda gave TWi the option of launching an AG version of Dexilant rather than launching its own ANDA product (assuming it received FDA approval).

168.    Because it was more profitable for TWi to launch as Takeda's AG than to launch its own ANDA product, this agreement had the same economic effect as an express no-AG agreement.  Had TWi launched its ANDA product, Takeda would have been able to launch an AG to compete against TWi to capture some portion of the sales that would otherwise go to TWi.  Thus, TWi would expect to earn greater profits from exercising the option to launch Takeda's AG as the exclusive generic, even if it had to share some monopoly profits with Takeda.

169.    Takeda has a long history of launching AG products through one or more third parties and likely would have done the same with generic Dexilant had it not given TWi the option to exclusive rights to launch the Dexilant AG.

1     170.    By granting the option to launch as its exclusive AG for Dexilant, Takeda

2  effectively gave TWi the option to be the exclusive seller of Dexilant until Par was permitted to

3  launch by its settlement agreement.  This promise was extremely valuable to TWi and induced

4  TWi to accept a later entry date.

5     171.    TWi's press release shortly after the settlement summarizes its AG rights in part as

6  follows:

7          As part of the settlement, the parties also entered into a License and
           Supply Agreement allowing TWi and its affiliates to sell Dexilant®
8          in both dosage strengths as the Authorized Generic. (emphasis
           added).
9
10                              *         *         *

11         Furthermore, the license and supply of the Authorized Generic from
           Takeda allows TWi to be *the supplier of both strengths of a*
12         *generic Dexilant® in the U.S. market for a period, which provides*
           *significant sales and marketing advantage* as well as furthering
13         TWi's goal of bringing affordable healthcare to patients. (emphasis
           added).
14

15     172.    TWi's use of the definite article "the" in identifying itself as "*the* supplier of both

16  strengths of generic Dexilant" in this press release confirms that Takeda did not retain the right to

17  launch a second "AG" if TWi chose to exercise its option to launch the AG rather than the ANDA

18  product.

19     173.    TWi's references to an agreed period of time where it would have a "significant

20  sales and marketing advantage" are important.  If Takeda retained the right to launch a second

21  AG to compete with TWi, there would be no "period" during which TWi would enjoy a

22  monopoly on generic sales and TWi would have no "significant sales and marketing advantage"

23  during any such time period.

24     174.    As promised, TWi did not enter the market on June 15, 2020 when the '282 patent

25  expired.  Instead, it waited until on or around January 1, 2022, at which point it exercised its

26  option to launch as an AG product pursuant to its agreement with Takeda.

27     175.    Takeda never launched an AG Dexilant product to compete with TWi.

28

176.    In fact, as previewed by TWi in its 2015 press release just after the Agreement was signed, the AG product TWi sold in 2022 was the sole generic on the market for nearly a year, until November 22, 2022, when Par launched a generic 60 mg dexlansoprazole delayed release capsule.

177.    Both Defendants benefitted from this unlawful Agreement pursuant to which they avoided fair and legal competition.

178.    Takeda benefited because it avoided AB-rated generic competition from TWi and was the sole seller of dexlansoprazole from June 15, 2020 until January 1, 2022.  Takeda also likely received some portion of the supracompetitive profits earned by TWi during the period when TWi was the only seller of generic Dexilant on the market.

179.    This unlawful extension of Takeda's monopoly allowed Takeda to continue charging monopoly prices longer than it would have otherwise.

180.    Sales of the AG product sold by TWi were more than $328 million in 2022 alone. Had Takeda launched an AG to compete with TWi's ANDA product, the AG would have likely captured about half of those sales.  TWi likely made these sales at a higher price than if it had to compete against an AG sold by Takeda.  Takeda was also likely able to represent to TWi that it would not face any additional generic competition for 11 months since it settled with Par and Impax before it settled with TWi.

181.    By giving TWi the option to be the exclusive seller of the AG, Takeda effectively gave up half of the $328 million in AG sales that it otherwise would have made.  This agreement not to launch an AG represented a large transfer of value from Takeda to TWi.  TWi benefited from a monopoly on sales of generic Dexilant from January 2022 through November 2022.  The ability to charge monopoly prices for generic Dexilant starting in January 2022, along with the $9.5 million payment from Takeda, compensated TWi for delaying its entry into the market.

**F.    Takeda Entered Into Other Alleged Improper Agreements With Competitors During This Same Time Period**

182.    Takeda had a practice of engaging in suspect agreements with competitors during this period of time.

183.    Approximately seven months prior to the Defendants' agreement concerning Dexilant, Takeda entered into an agreement with generic competitor Par concerning a different Takeda drug called Amitiza (the "Amitiza Agreement").

184.    Like the Agreement in this case, the Amitiza Agreement is alleged to have been designed to delay and suppress generic competition.  Specifically, Par agreed to delay the launch of its generic Amitiza product in exchange for an implicit no-AG commitment from Takeda.

185.    Several antitrust lawsuits have been filed, and the court overseeing the case denied a motion to dismiss by Takeda, holding that the complaints in that case plausibly alleged an antitrust violation.

186.    A little over a year after the Amitiza agreement, and within a year of Defendants' Agreement here, Takeda entered into agreements with different competitors concerning its brand drug Colcrys ("Colcrys Agreement").

187.    According to the plaintiffs in an antitrust case against Takeda arising out of that settlement agreement, Takeda agreed with its generic competitors to allocate the market for Colcrys.

188.    In particular, under the Colcrys Agreement, generic competitors allegedly agreed to delay their market entry in exchange for defined periods of exclusivity at a later date.

189.    The Colcrys plaintiffs defeated a motion to dismiss and summary judgment, and Takeda ultimately settled at trial before a verdict was rendered.[38]

**G.    If Takeda Retained the Right to Launch an AG or Received Royalties From TWi, Such Facts Would Not Change the Illegality of Defendants' Agreement**

190.    The terms of Defendants' Agreement were not publicly disclosed.

191.    However, Takeda and other pharmaceutical companies have, as alleged in Amitiza, entered into similar reverse payment agreements with competitors that attempt to avoid

---

[38] *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, 2023 WL 11897154, at *1 (E.D. Pa. Aug. 3, 2023).

antitrust liability by purporting to reserve rights to launch AGs and/or require royalties from the generic competitor when it eventually launches after the delay.

192.    Insofar as Defendants' Agreement here contained such terms, they would not change the illegality of Defendants' conduct.

193.    With regard to No-AG agreements, courts, including in the Amitiza lawsuit against Takeda, have held that such agreements need not be explicit: "implicit no-AG agreement[s]" are also unlawful.[39]  Even if Takeda purported to reserve some ability to launch another AG in Defendants' written agreement, the facts—including, inter alia, Takeda's failure to exercise any such right and TWi's statements suggesting it had exclusivity—show that any such reservation was pretextual.

194.    Nor does the payment of royalties by the generic change the analysis.  In *Amitiza*, Takeda argued that there could be no reverse payment if a settlement agreement required a generic to pay royalties to the brand.  The *Amitiza* court not only rejected this argument, but further held that Takeda's royalty structure with the generic in that case itself plausibly alleged a reverse payment.[40]

195.    Indeed, any royalties that may have been included in the settlement agreement were likely structured, as in *Amitiza*, to reinforce Takeda's commitment not to launch an AG.  For example, in *Amitiza*, Takeda negotiated a declining royalty structure where the royalty declined from 50% to 15% if Takeda launched an AG.  Such provisions financially disincentivize Takeda from launching an AG and would not eliminate the anticompetitive effects of Defendants' agreement.

196.    Even if the agreement between Takeda and TWi required TWi to pay 50% of its AG sales to Takeda, TWi would have been substantially better off than if it had to compete with Takeda's AG.  As set forth above, sales of the AG product sold by TWi were more than

---

[39] *Picone v. Shire PLC*, 2017 WL 4873506, at *9 (D. Mass. Oct. 20, 2017); *see also In re Amitiza*, 2022 WL 17968695, at *4 (denying motion to dismiss antitrust claims against Takeda premised in part on an implicit agreement not to launch an AG).

[40] *In re Amitiza*, 2022 WL 17968695, at *4.

COMPLAINT AND DEMAND FOR JURY TRIAL

$328 million in 2022. As a general matter, when there is only a single generic on the market, the generic is priced at about 90% of the brand price, but when there are two generics on the market, the generic price is 60% of the brand price. Thus, a rough estimate of the reverse payment if TWi agreed to a 50% royalty as in *Amitiza* is $54.7 million. This estimate is based on the increased benefit that TWi would get from the higher generic price. TWi would get half of the AG sales whether it competed against Takeda or paid a 50% royalty, but TWi's 50% share would be worth $54.7 million more with a single generic on the market than with two. Takeda's $164 million share at a generic price of 90% of the brand is the equivalent of $182.2 million in brand sales ($164 million/90%), which would be $109.3 million in generic sales at 60% of the brand price ($182 million x 60%). Thus, even at a 50% royalty rate, TWi would make $54.7 million ($164 million – $109.3. million) more selling a single generic than it would competing with Takeda's AG.[41]

**H.    In the Absence of Defendants' Agreement, At Least Two Generics Would Have Been Available, at a Much Lower Price Point, by No Later Than June 15, 2020**

197.    In the absence of Defendants' unlawful agreement, at least two generics would have been available by no later than June 15, 2020, when the '282 patent expired. The '158 and '187 patents would not have altered this result, given the likelihood that TWi would have prevailed on its defenses on those patents at any jury trial. Even if another appeal occurred because of that trial, it would have been resolved well before June of 2020, as the speedy appeal of the judgment on the '282 patent (where a judgment was entered by Judge Spero in December of 2013 and argued before the Federal Circuit in March of 2015) demonstrates.

198.    *First*, TWi's ANDA would have been approved on or before its entry date in 2020. TWi's ANDA was ultimately approved in September 2022, but approval would not have taken that long absent Defendants' unlawful agreement. FDA has a practice of focusing its limited resources on the approval of products whose launches are imminent. TWi's agreement to delay

---

[41]This is a rough estimate. It will likely be possible to make a more precise estimate with the benefit of discovery which will include the actual settlement agreement and defendants' own estimates at the time of the settlement.

its launch, coupled with its ability to come to market as an AG under Takeda's NDA, disincentivized TWi from aggressively seeking earlier approval and eliminated the need for FDA to act on TWi's application sooner.

199.    *Second*, there were no first filer exclusivities standing in the way of TWi.  Neither Par on the 60 mg product nor Impax on the 30 mg product obtained tentative approval within 30 months of filing their ANDAs.  As a result, they both forfeited their first-to-file exclusivity.  In addition, neither of them could launch earlier than TWi because their generic formulations were found to infringe patents with expiration dates later than the June 15, 2020 expiration date of the '282 patent.

200.    *Third*, Takeda's patents would not have delayed TWi's entry date.  Takeda stipulated that several of its patents, specifically, the '058, '276, '971 and '668 patents, would not be infringed by TWi, and TWi prevailed at trial on all but the '282 patent, which expired in June 2020.  While Takeda sued TWi on the '187 and '158 patent in a separate lawsuit, had the parties not settled, TWi would have prevailed on those patents.  Among the reasons that TWi would have prevailed, these patents were plainly invalid due to prior art.  Indeed, Takeda indicated that it did not view the later-expiring patents as likely to keep generics off the market after June of 2020.  Prior to the unlawful Agreement with TWi, Takeda stated that: "[b]ased on the ruling, Takeda expects the first generic entry no earlier than June 2020."

201.    *Fourth*, FDA was highly likely to approve TWi's ANDA prior to June of 2020.  Any delay in obtaining such approval following the settlement was likely due to the fact that TWi was in no rush to obtain it earlier because it had the guarantee that it could sell Takeda's Dexilant AG commencing in 2022, which would allow it to reap supracompetitive profits even in the absence of FDA approval.  Absent Defendants' unlawful Agreement, no such safety net would exist, and TWi would have had every incentive to obtain FDA approval as swiftly as possible.  The Agreement in essence resulted in TWi's calculated slow rolling of its efforts to get approval of its ANDA product, because it knew that it was unlikely to launch before 2022 and that once it launched it would launch as Takeda's AG for which it did not need ANDA approval.

1

## VII.    MARKET POWER AND RELEVANT MARKET

2      202.    The prescription pharmaceutical marketplace is characterized by a "disconnect"

3    between product selection and the payment obligation.  State laws prohibit pharmacists from

4    dispensing prescription pharmaceutical products, including Dexilant, to patients without a

5    prescription.  The prohibition on dispensing such products without a prescription creates this

6    disconnect.  The patient's doctor chooses the product the patient will buy, while the patient (and

7    in most cases his or her insurer) has the obligation to pay for the product.

8      203.    Brand manufacturers, including Takeda, exploit this price disconnect by

9    employing large sales forces that visit doctors' offices and persuade them to prescribe the brand

10    manufacturers' products.  These sales representatives do not advise doctors of the cost of brand

11    products.  Studies show that doctors typically are not aware of the relative costs of brand

12    pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive

13    to price differences because they do not pay for the products.  The result is a marketplace in

14    which price plays a comparatively unimportant role in product selection.

15      204.    The relative unimportance of price in the pharmaceutical marketplace reduces

16    what economists call the cross-price elasticity of demand—the extent to which rising prices of a

17    product cause unit sales to decline because of substitution to other products.  This reduced cross-

18    price elasticity, in turn, gives brand manufacturers the ability to raise prices substantially above

19    marginal cost without losing so many sales as to make the price increase unprofitable.  The ability

20    to profitably raise prices substantially above marginal costs is what economists and antitrust

21    courts refer to as market power.  The result of these pharmaceutical market imperfections and

22    marketing practices is that brand manufacturers gain and maintain market power with respect to

23    many brand prescription pharmaceuticals.

24      205.    Before January 1, 2022, Takeda had monopoly power in the market for Dexilant

25    because it had the power to maintain the price of dexlansoprazole at supracompetitive levels

26    without losing sales that would make the supracompetitive prices unprofitable.  From January 1,

27

28

2022 through at least November 22, 2022, Takeda and TWi combined had substantial market power in the market for Dexilant and its generic equivalent.

206.    Before January 1, 2022, a small but significant, non-transitory increase in the price of brand Dexilant would not have caused a loss of sales that would make the price increase unprofitable.  From January 1, 2022 through November 22, 2022, a small but significant non-transitory increase in the price of generic Dexilant would not have caused a loss of sales that would make the price increase unprofitable.

207.    Brand Dexilant does not exhibit significant, positive cross-elasticity of demand with respect to price with any other drug other than AB-rated generic versions of Dexilant.

208.    Brand Dexilant is differentiated from all other drugs other than the AB-rated generic versions of Dexilant.

209.    Takeda (and later, Takeda and TWi) needed to control only brand Dexilant and its AB-rated generic equivalents, and no other products, in order to maintain the price of dexlansoprazole profitably at supracompetitive prices.  Only the market entry of competing AB-rated generic versions of Dexilant would render the Defendants unable to profitably maintain their prices for Dexilant and generic Dexilant without losing substantial sales.

210.    For several years, Takeda earned supracompetitive profit margins by selling brand Dexilant at prices well in excess of its marginal cost and in excess of its competitive price.

211.    From January 1, 2022 through November 2022 and beyond, TWi earned supracompetitive profit margins by selling AG Dexilant at prices well in excess of its marginal cost and in excess of its competitive price.

212.    Takeda had, and exercised, the power to exclude generic competition to brand Dexilant.

213.    Takeda and TWi had, and exercised, the power to exclude generic competition to the TWi-marketed AG Dexilant.

214.    At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected brand Dexilant from the forces of price competition.

215.    There is direct evidence of market power in this case because Defendants were able to profit by charging supracompetitive prices for brand and generic Dexilant.  The direct evidence includes, inter alia, the following facts: (i) generic Dexilant would have entered the market at a much earlier date, at a substantial discount to brand Dexilant, absent Defendants' anticompetitive conduct; (ii) Takeda's gross margin on Dexilant at all relevant times was very high; (iii) Takeda never lowered the price of Dexilant to the competitive level in response to the pricing of other brand or generic drugs; (iv) the conversion of most of brand Dexilant's sales to generic Dexilant once it was available; and (v) the fact that Takeda found it profitable to pay TWi to delay generic entry.  On this last point, as the Supreme Court recognized in *Actavis*, firms lacking market power are not likely to pay a competitor a large sum to avoid the risk of competition.  570 U.S. at 157.

216.    Bora understood Takeda's strategies and supported them once Bora acquired TWi in October of 2022.

217.    Upsher was aware of Takeda's strategies at least at the time it was acquired by Bora and merged with TWi.

218.    To the extent that it is necessary to define a relevant product market to prove monopoly power, Plaintiff alleges that the relevant antitrust market is the market for Dexilant and its AB-rated generic equivalents.

219.    The United States and its territories constitute the relevant geographic market.

220.    Takeda's share of the relevant market was 100% until January 1, 2022, after which Takeda and TWi collectively had 100% market share in the relevant market until November 22, 2022 when Par launched a 60 mg generic Dexilant product.

## VIII.   ANTICOMPETITIVE EFFECTS

221.    Takeda and TWi willfully and unlawfully maintained Takeda's market power—and the corresponding ability to charge monopoly prices—by entering into a reverse payment Agreement that delayed the entry of generic Dexilant.  Takeda paid TWi $9.5 million in cash and

effectively granted TWi an 11-month monopoly over the sale of generic Dexilant until Par launched in November 2022.  In return, TWi's agreed to delay its generic entry.

222.    Takeda and TWi unlawfully maintained Takeda's market power by engaging in an overarching scheme to exclude competition.  Defendants delayed generic competition, allowing Takeda to earn supracompetitive profits on its brand product while generic competition was delayed and TWi to earn supracompetitive profits on its sales of Takeda's AG during the time that it was the exclusive generic distributor.  Defendants' scheme had the anticompetitive effect of maintaining supracompetitive prices.

223.    Bora and Upsher joined in this unlawful Agreement as described above, with Upsher operating as the successor of TWi once it merged with TWi in 2024.

224.    Defendants implemented the scheme as described above.  These acts, in combination and individually, were undertaken to serve Defendants' anticompetitive goals.

225.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Dexilant, and later the TWi-marketed AG Dexilant, from competition.  These actions allowed Defendants to maintain a monopoly and exclude competition in the market for brand and generic Dexilant to the detriment of Plaintiff.

226.    Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Takeda to sell brand Dexilant without generic competition, and then for TWi to sell AG Dexilant without generic competition.  Absent Defendants' illegal conduct, one or more generic versions of Dexilant would have entered the market sooner and TWi would have faced competition when it eventually came to market with its generic product.

## IX.    INTERSTATE COMMERCE

227.    During the relevant time period, Defendants manufactured, sold, and shipped brand and generic Dexilant across state lines in an uninterrupted flow of interstate commerce.

228.    During the relevant time period, Plaintiff and/or its assignors purchased substantial amounts of brand and generic Dexilant directly from Defendants.  As a result of Defendants'

illegal conduct: (i) the entry of a generic Dexilant was delayed and the price of generic Dexilant when it ultimately became available was higher than it would have been absent the violation; and (ii) Plaintiff and its assignors were compelled to pay, and did pay, artificially inflated prices for brand and generic Dexilant.

229.    During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and/or interstate and foreign wire commerce.  All the Defendants engaged in illegal activities, as charged herein, within the flow of, and substantially affecting, interstate commerce.

230.    Defendants' conduct was within the flow of and was intended to have and did have a substantial effect on, interstate commerce in the United States and its territories, including in this District.

231.    During the relevant time period, each Defendant, or one or more of each of Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme.  The scheme in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States and its territories.

## X.    ACCRUAL AND FRAUDULENT CONCEALMENT

232.    By virtue of its assignments, Plaintiff is an absent class member in a putative direct purchaser class action pending in this Court.  *See KPH Healthcare Servs., Inc. v. Takeda Pharm. Co. Ltd.*, Civil Action No. 3:25-cv-02966-JSC (filed Mar. 31, 2025).  The KPH Healthcare complaint was filed on March 31, 2025 and tolled the applicable statute of limitations as to all putative class members.  Thus, Plaintiff is entitled to recover all overcharges accruing on purchases of brand or generic Dexilant beginning four years prior to the filing of the KPH Healthcare complaint on March 31, 2025.

233.    However, Plaintiff may recover damages even on purchases made more than four years prior to the filing of the KPH Healthcare complaint because Defendants fraudulently concealed their antitrust violation.

234. Defendants have never publicly disclosed the material terms of their settlement agreement. Moreover, Defendants' scheme was self-concealing. Defendants affirmatively concealed their scheme. For example, TWi's press release regarding the settlement made no mention of the $9.5 million payment it received from Takeda and did not disclose any information regarding Takeda's agreement not to launch a competing AG. Defendants affirmatively chose not to publicly disclose critical and material details of their Agreement to hide the Agreement's anticompetitive features.

235. It was not until TWi launched Takeda's AG in January 2022 that the nature and terms of Defendants' Agreement was revealed.

236. Plaintiff had no knowledge of Defendants' unlawful scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this litigation.

237. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations governing Plaintiff's claims have been tolled.

## XI.    CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF 15 U.S.C. § 1
### (RESTRAINT OF TRADE - AGAINST ALL DEFENDANTS)

238. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 237 above as though fully set forth herein.

239. Takeda and TWi engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

240. On or about April 24, 2015, Takeda and TWi entered into a reverse payment agreement under which Takeda paid TWi substantial consideration in exchange for TWi's agreement to delay bringing generic Dexilant to the market. The reverse payment consisted of a cash payment of $9.5 million to TWi and a commitment not to launch its own authorized generic Dexilant product to compete with TWi's generic version of Dexilant worth more than $50 million.

241.    The purpose and effect of this reverse-payment agreement was to: (a) allocate to Takeda 100% of the U.S. sales of dexlansoprazole until January 2022; (b) delay the availability of generic Dexilant in the United States, thereby protecting Dexilant from any generic competition until January 2022; (c) allocate to TWi, 100% of the U.S. sales of generic dexlansoprazole beginning on January 2022 and continuing to November 22, 2022; and (d) fix and maintain, at supracompetitive levels, the price Plaintiff paid for dexlansoprazole.

242.    The reverse payment to Par was large and unjustified.

243.    From the launch of brand Dexilant in 2009, Takeda possessed monopoly power in the relevant market—i.e., the market for sales of dexlansoprazole in the United States.  In the absence of Defendants' wrongful conduct, as alleged herein, Takeda would have lost its monopoly power in the relevant market well before it did on or around January 1, 2022.

244.    There is and was no legitimate, non-pretextual, procompetitive justification for the reverse payment to Par that outweighs its harmful effect.  The value of the payments exceeds the cost of continued litigation avoided by settling, and there is no other procompetitive reason for Takeda to have made these payments to TWi.  Even if there were some conceivable justifications, the payments were not necessary to achieve, or were not the least restrictive means of achieving, such a purpose.  Accordingly, the reverse payment violates the antitrust laws under the rule of reason.

245.    As a direct, proximate, foreseeable, and intended result of the reverse-payment by Takeda, Plaintiff has been injured in its business or property.  Its injury consists of having paid higher prices for brand and generic Dexilant purchased from Defendants than it would have paid in the absence of the violations.  Such "overcharges," are the type of injury that the antitrust laws were designed to prevent, and flow from that which makes the Defendants' conduct unlawful. Plaintiff, as a direct purchaser and/or the assignee of a direct purchaser from Defendants, is a proper entity to bring a case concerning this conduct.

246.    Bora and Upsher subsequently ratified this Agreement by their conduct described herein and Upsher succeeded TWi when the two entities merged in 2024.

1

2

**COUNT TWO – VIOLATION OF 15 U.S.C. § 1**
**(MARKET ALLOCATION - AGAINST ALL DEFENDANTS)**

3       247.    Plaintiff hereby repeats and incorporates paragraphs 1 through 237 as though fully

4    set forth herein.

5       248.    The reverse payment agreement agreed to by Takeda and TWi on April 24, 2015,

6    was an unlawful horizontal market-allocation agreement that violated section 1 of the Sherman

7    Act.  Such agreements are unlawful *per se—i.e.*, they are conclusively presumed to have

8    substantial adverse effects on competition in the relevant market.  Proof of actual adverse effects

9    or of market power, whether direct or indirect, is unnecessary in a *per se* case.

10      249.    The agreement between Takeda and TWi was a *per se* unlawful horizontal market-

11   allocation agreement that allocated all sales of Dexilant and its AB-rated equivalents to Takeda

12   until January 2022 and all sales of AB-rated generic Dexilant to TWi from January 2022 through

13   November 2022.  TWi agreed not to compete with Takeda until January 2022, and Takeda agreed

14   not to compete with TWi from January 2022 through November 2022.

15      250.    Horizontal market-allocation agreements, including temporal horizontal market

16   allocation agreements, are illegal *per se*.

17      251.    But for Defendants' antitrust violation, generic competition to Dexilant would

18   have begun by June 2020.  Plaintiff and/or its assignors would have paid lower prices for

19   dexlansoprazole beginning in June 2020.  As a result of Defendants' antitrust violation, Plaintiff

20   has been injured in its business or property and continues to suffer such injury.  Plaintiff's actual

21   and threatened injury is injury of the type the antitrust laws were designed to prevent and flows

22   from that which makes Defendants' conduct unlawful.

23      252.    Plaintiff has been injured by this conduct and seeks treble damages.

24

**COUNT THREE – VIOLATION OF 15 U.S.C. § 2**
**(MONOPOLIZATION - AGAINST TAKEDA)**

25

26      253.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through

27   237 as though fully set forth herein.

28

254.    At all relevant times prior to 2022, Takeda possessed monopoly power in the market for dexlansoprazole. Takeda possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

255.    By entering into a reverse- payment agreement with TWi that included a large and unjustified payment, Takeda willfully and intentionally maintained, enhanced, and extended its monopoly power using restrictive or exclusionary conduct. Specifically, Takeda (a) allocated to itself 100% of the market for dexlansoprazole in the United States until January 2022 (b) delayed the availability of generic versions of Dexilant in the United States, thereby protecting Dexilant from any generic competition until January 2022; (c) allocated to itself and TWi collectively 100% of the market for generic dexlansoprazole in the United States beginning on January 2022 and continuing for 11 months until Par launched in November 2022; and (d) fixed and maintained, at supracompetitive levels, the price Plaintiff paid for dexlansoprazole.

256.    The goal, purpose, and/or effect of Takeda's scheme was to maintain and extend its monopoly power with respect to Dexilant. Takeda's illegal scheme to delay the introduction of generic Dexilant allowed it to continue charging supracompetitive prices for the drug without a substantial loss of sales.

257.    During the relevant period, Plaintiff's assignors purchased substantial quantities of brand Dexilant directly from Takeda. Plaintiff and/or its assignors also purchased substantial quantities of generic Dexilant directly from TWi and other generic manufacturers. As a result of Takeda's illegal conduct, Plaintiff and its assignors were compelled to pay, and did pay, inflated prices for brand and generic Dexilant.

258.    As a direct, proximate, foreseeable, and intended result of Takeda's illegal and monopolistic conduct, Plaintiff and/or its assignors paid prices for Dexilant that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because Plaintiff and/or its assignors were deprived of the opportunity to purchase lower-priced generic Dexilant instead of the more expensive brand Dexilant. The total amount of Plaintiff's damages will be determined at trial.

259.    The anticompetitive consequences of Takeda's actions far outweigh any arguable procompetitive benefits. Takeda acquired and extended a monopoly through unlawful means.

## XII.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff seeks judgment against all Defendants, jointly and severally where appropriate, and for the following relief:

1.    An award of Plaintiff's overcharge damages in an amount to be determined at trial, trebled as provided by law;

2.    The costs of this suit, including reasonable attorneys' fees, as provided by law; and

3.    Such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  September 9, 2025                    Respectfully submitted,

                                            /s/ Anna T. Neill
                                            Anna T. Neill
                                            SPERLING KENNY NACHWALTER
                                            Four Seasons Tower, Suite 1100
                                            1441 Brickell Avenue
                                            Miami, FL 33131
                                            Telephone: (305) 373-1000
                                            Facsimile: (305) 372-1861
                                            Email: aneill@sperlingkenny.com
                                            *Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Of counsel:**

Barry L. Refsin (*pro hac vice forthcoming*)
Eric L. Bloom (*pro hac vice forthcoming*)
Alexander J. Egerváry (*pro hac vice forthcoming*)
Caitlin V. McHugh (*pro hac vice forthcoming*)
Cary Zhang (*pro hac vice forthcoming*)
HANGLEY ARONCHICK SEGAL PUDLIN &SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200
Email: brefsin@hangley.com
Email: ebloom@hangley.com
Email: aegervary@hangley.com
Email: cmchugh@hangley.com
Email: czhang@hangley.com